**In re Joseph T. SEVITSKI, Jr. d/b/a Sevitski & Associates, Debtor,**

**Sevitski and Associates, Inc., Debtor.**

**Bankruptcy No. 92–00594–W.**

United States Bankruptcy Court, N.D. Oklahoma.

Dec. 9, 1993.

848

Sidney K. Swinson, Tulsa, OK, Trustee.

Mark Craige, Tulsa, OK, for Irving Einhorn.

### ORDER GRANTING IN PART AND DENYING IN PART "MOTION TO APPROVE ADMINISTRATIVE CLAIM OF IRVING EINHORN, PREPETITION RECEIVER"

MICKEY DAN WILSON, Chief Judge.

Irving Einhorn, pre-petition receiver, moved for award of his fees and costs under 11 U.S.C. § 543(c)(2), with priority of payment as an administrative expense under 11 U.S.C. § 503(b)(3)(E). Objections were filed by various parties in interest. After hearing, the matter was taken under advisement. Upon consideration of evidence introduced and received, and of the record in this case

and in the related case No. 91–01773–W *In re Tallgrass Petroleum Corporation*, the Court, pursuant to F.R.B.P. 7052 and 9014, finds, concludes, and orders as follows.

### FINDINGS OF FACT

Joseph T. Sevitski, Jr. ("Sevitski") owned and controlled various business enterprises, including Sevitski & Associates, Inc. ("Sevitski Inc."), Midland Fuel Corporation ("Midland"), Welcome Oil Corporation ("Welcome Oil"), JPHL Investments, Inc. ("JPHL"), Sevitski Pipe & Equipment Corp. ("Sevitski Pipe"), and Henryetta Oil Supply Company ("Henryetta Oil"). These enterprises were ostensibly separate corporations and partnerships; but Sevitski allowed his own financial affairs and those of his various enterprises to become thoroughly and inextricably intertwined. In the following findings and conclusions, "Sevitski" refers to Sevitski individually and also to his various business enterprises, unless otherwise specified or indicated by context.

Sevitski solicited investors to invest money in oil and gas projects developed and operated by Sevitski. For the most part, the investors were in California while the oil and gas projects were in Oklahoma. Sevitski maintained offices in both California and Oklahoma. In soliciting investments in California, Sevitski did not comply with requirements of securities laws of the United States of America or of the State of California. In conducting oil and gas operations in Oklahoma, Sevitski did not comply with environmental requirements of the United States of America or of the State of Oklahoma. Investors thought they were committing their money to specific oil and gas projects; but Sevitski commingled all funds he received in a single general operating account, and spent money from that account as he pleased. Sevitski is said to have collected more than $21,000,000 from investors, of which "less than $3,000,000 appears to have been invested in oil or gas producing properties or equipment," am. motion ex. A p. 8.

In 1991, at the instigation of the California Department of Corporations, the Superior Court of the State of California for the County of Los Angeles ("State court") imposed a

receivership on Sevitski. The State court appointed Irving M. Einhorn ("Einhorn") as receiver. Einhorn says the appointment was made on May 24, 1991; but his time records (discussed in more detail below) begin on February 14, 1991. Einhorn is a securities lawyer in solo practice. Despite his lack of extensive in-house office support, he says he has been appointed to more than a dozen receiverships in the course of his securities practice. Before the Sevitski receivership, Einhorn had no significant experience or expertise in oil and gas operations or litigation.

On October 14, 1991, Einhorn executed a "Receiver's Status Report" ("First Report"), which was filed in State court on or about November 7, 1991. The following account of Einhorn's receivership is drawn mainly from this First Report, supplemented by other statements appearing of record herein and evidence received at hearing on Einhorn's motion.

Einhorn was appointed to "receive" estates whose property was mostly two thousand miles away. The condition of these estates made this job especially difficult.

[Einhorn] took control of the offices of Sevitski ... in Westlake Village [California, and in] Pryor, Oklahoma ... [He] then attempted to determine what records existed which might be helpful in determining the condition of the estate. It became immediately apparent that Sevitski ... did not maintain any semblance of traditional corporate books and records. There were no accounting records of any kind ... The records that were found were not catalogued or in any particular order and ... were incomplete ... [Einhorn] determined that there was no accurate record of the assets and liabilities of Sevitski ...

Since his appointment, [Einhorn] has attempted to secure all assets belonging to the estate, and attempted to determine the exact assets and liabilities of the estate. In order to carry out his responsibilities, [Einhorn] has employed certain former Sevitski ... employees familiar with Sevitski['s] operations ... [and] has also engaged consultants with broad experience in oil and gas operations to advise him and assist in negotiations with creditors [and with] property owners ...,

1st Rep. pp. 3–5 appended to 2nd Rep. In particular, Einhorn hired Homer Muto ("Muto"), a former accountant of Sevitski, to do accounting for Einhorn as receiver; and Fred Luke ("Luke") of Wilson Development Corp. ("Wilson Corp.") to supervise oil and gas operations. Luke lives in California, and traveled to and from Oklahoma to deal with Sevitski's properties in Oklahoma. Einhorn's general approach to receivership administration was as follows:

[Einhorn], in order to preserve the extremely limited cash resources of the estate, has only engaged counsel to handle specific situations. [Einhorn] has not engaged an accounting firm to assist in the tracing of funds, again in an effort to preserve the assets of the estate from being consumed with administrative costs ...

[D]ue to limited cash resources, [Einhorn] has prioritized his efforts, focusing his efforts on what appeared to be the most pressing problems ... and allowing less immediate concerns to await such time as funds become available to pursue them. [Einhorn] set the following priorities on which to concentrate his initial efforts:

A. Determining the extent of property and equipment belonging to the estate and securing same;

B. Determining all liabilities of the estate;

C. Determining what monies were raised by Sevitski ... and what happened to said funds;

D. Negotiating with creditors for forbearance;

E. Advising investors as to what had happened to their investments;

F. Placing properties into production in order to generate income for the estate;

G. Pursue claims and recovery of property wrongfully taken from the estate,

*id.* pp. 6–7. Regarding priority F. above, Einhorn told the State court that he

has been placing properties into production, starting with those properties determined to have the greatest potential to

generate operating profits for the estate. Due to the fact that these properties had been neglected for an extended period of time, in order to place them back into production, [Einhorn] had to engage contractors to do various types of rehabilitation work on the properties before production could commence. In addition, back utility bills had to be paid before the utility would turn on electricity to enable work to commence on the property,

id. p. 9. However, when discussing the various properties in detail, Einhorn states clearly and unambiguously that he has restored production on only two wells (on the Kincaid and Spade leases); and states less clearly that somebody, at some time, has commenced or restored production on only half a dozen more (on the Hammer and Hilltop leases, not counting an unspecified number of gas wells comprising the Schulter gas system), id. pp. 10–18.

Einhorn told the State court that he had "been obliged to expend monies to correct environmental hazards created b[y] the failure of Sevitski ... to observe environmental regulations in Oklahoma," id. p. 10. Einhorn said he "has been working with" authorities of the State of Oklahoma "to correct these problems," id. The State Court in California did not hear the State of Oklahoma's opinion of Einhorn's efforts; but this Court later did. According to David "Don" Williams ("Williams"), a field inspector for the Oklahoma Corporation Commission, Einhorn himself was almost impossible to contact, and his assistant Luke appeared at various wells for only 3 or 4 days each month. During Williams' few and brief contacts with Einhorn and Luke, Williams tried to get various hazards cleaned up (such as powerful electric cables lying about on the ground), to get pollution stopped, to get wells plugged or restored to production, and to get bonds posted covering such work. Einhorn and Luke made promises, which were consistently not kept. In Williams' opinion, Einhorn's receivership made no significant improvement in the environmental condition or commercial production of the Sevitski oil and gas properties. Einhorn left these properties much as he found them.

Einhorn devoted the most space in his report to recounting his adventures with respect to the Osage leases, which were "the most valuable properties that Sevitski ... owned" but which Sevitski had caused to be "titled in the name of Tallgrass Petroleum ["Tallgrass"], which is in Chapter 11 Bankruptcy in Tulsa, Oklahoma," id. p. 15.

[Einhorn was] unable to determine the reason why Sevitski did this—Sevitski has only indicated that he did this under great duress. [The duress apparently came from various parties herein called "the Welcomes," who] have succeeded in placing Tallgrass into Chapter 11 bankruptcy and their trustee remains in control of the [Osage] properties.

[Einhorn] attempted to negotiate a resolution of this matter directly with the Welcome[s] ... and their counsel ... [T]hey were in fact just stalling for time. They have caused their bankruptcy trustee to file an adversary action against the receivership estate to obtain Tallgrass's records from [Einhorn's] possession and control. [Einhorn] has engaged bankruptcy counsel in Oklahoma who will aggressively pursue the return of these properties to the receivership estate from which they appear to have been wrongfully taken.

There is no way of predicting whether [Einhorn] will be successful in this endeavor. [Einhorn] is gathering bank records which will prove that investor funds from Sevitski ... paid for the Osage properties. [Einhorn] will also demonstrate that Tallgrass and the Welcome[s] ... did not give Sevitski ... any consideration for the assignment of these properties to Tallgrass. [Einhorn] also will demonstrate that he controls the interests of Sevitski ... It is hoped that with this evidence before the bankruptcy court, the [receivership] estate will be able to recover these properties,

id. pp. 17–18. Einhorn did not tell the State court that he was refusing to turn over records which were property of the Tallgrass bankruptcy estate, in violation of Federal law and in disregard bordering on contempt of the authority of this Bankruptcy Court. Indeed, Einhorn was behaving almost as if the Tallgrass bankruptcy case did not exist.

Indeed, Einhorn himself was mostly "stalling for time." As he put it,

> [Einhorn] also found that all of the leases ... contained forfeiture provisions which would allow the property ... to revert back to the lessor if the lessee ... did not develop the property and generate revenue from the production of oil or gas. The estate was in default on all of these properties when [Einhorn] was appointed. Through negotiations with the lessors, [Einhorn was] able to retain all of the properties belonging to the estate when he took over,

*id.* Besides lessors, other creditors of Sevitski were owed debts which Einhorn estimated at half a million dollars. Einhorn

> was able to obtain the cooperation of all creditors who exercised great restraint in forbearing from taking any action which would threaten the ability of [Einhorn] to marshall the assets belonging to the estate,

*id.* p. 7. This "forbearance" and "cooperation" was achieved by threatening Sevitski's creditors with bankruptcy.

> [Einhorn] has advised all concerned ... that he will not permit any party to obtain a preference through foreclosure on a lien or any other type of action ... [He] has indicated that he will place the estate into bankruptcy before permitting any preferences to occur. It is apparent to all concerned that such an action would result in the least favorable return to investors and creditors alike, given the costs associated with bankruptcy actions in general,

*id.* p. 21. Meanwhile, Einhorn liquidated ready assets such as checking accounts, oil in storage, office furniture, vehicles ("among other things, a motor home, an airplane and a boat," *id.* p. 6), and certain unspecified "unnecessary equipment," *id.* p. 7—or such equipment as was not stolen before it could be sold. Einhorn "used the proceeds to fund operations," *id.* In other words, the oil and gas properties did not produce enough to pay their own expenses; and the ready assets were used up to pay for "operations" (or preparations for operations) which never got off the ground.

In the course of his receivership, Einhorn collected funds totalling $376,254.74. Before March 4, 1992 (a date whose significance appears below), Einhorn paid out $323,-661.24. On November 20, 1991, the State court approved Einhorn's fees of $101,375.00 (at a rate of compensation of $250 per hour) and expenses of $4,056.07 for a total of $105,-431.07. Of this total, Einhorn paid himself only $15,000, which is included in the $323,-661.24 in receivership expenses mentioned above. The reason was that "funds are not presently available to satisfy [Einhorn's full] request," *id.* p. 26. Einhorn told the State court that "if his fee application is approved, [he] would begin drawing funds from the estate as they become available, [but] would not take fees if doing so would disrupt the operations of the estate," *id.* The balance of Einhorn's fee, over $90,000, remained owing to him by the receivership estate. Thereafter, Einhorn went on incurring more fees and expenses which (as set forth in more detail below) eventually added another $47,000–odd to the receivership's debts. In addition, Einhorn acknowledged debts to his assistants Homer Muto, Fred Luke and Wilson Corp. which (as set forth in more detail below) totalled approximately $153,000. However, the receivership expenses mentioned above as already paid by Einhorn include $12,-372.97 paid to Wilson Corp. as reimbursement for costs expended by Wilson Corp. For purposes of this opinion, this Court presumes that the $150,000–odd owed to Wilson Corp. is reducible by the $12,000–odd paid to Wilson Corp.

In sum, Einhorn had collected $376,254.74 in cash plus some unliquidated assets of problematical value; in the process he spent $323,661.24 and incurred unpaid debts of over $280,000.00; and he had no significant production of oil and gas to show for it. What this meant was clear enough. Einhorn tried to sell the white elephant to a "group" consisting of Sevitski's investors or their "friends or relatives.", *id.* p. 23. This "group" optimistically proposed to "pa[y] off all creditor[s] and investors alike [all $21.5 million worth of them] over a period of approximately two years," *id.* Potential lenders were not enthusiastic, and the group was "unable to obtain necessary financing," *id.* Thereafter, Einhorn told the State court that

he "intends to continue to place properties into production in order to generate additional revenues which he can use to pay creditors and place additional properties into production," *id.* p. 24. A few sentences later, Einhorn confessed that he "ha[d] been unable to convince creditors to allow him sufficient time ... to come up with a plan to pay them off," and he expected some of them to "take legal action to seize assets belonging to the estate for their personal benefit," *id.* p. 25. He therefore expressed a second intention, which was to seek the State court's approval "to place the estate into bankruptcy to protect the assets from a run by individuals ...," *id.*

The State court granted Einhorn authority to put the Sevitski estates into bankruptcy. Einhorn did not act on this authority until his hand was forced by other events.

On February 24, 1992, some of Sevitski's creditors filed in this Court a petition for involuntary bankruptcy under 11 U.S.C. Chapter 7 against Sevitski individually and against Sevitski Inc. Instead of answering the involuntary petitions as provided by F.R.B.P. 1011(b), Einhorn on March 4, 1992 filed voluntary petitions for relief under 11 U.S.C. Chapter 7 in this Court for and on behalf of Sevitski individually, Sevitski Inc., Midland, Welcome Oil, JPHL, Sevitski Pipe, and Henryetta Oil. This Court entered an order for relief in all seven cases on March 4, 1992, which said order was docketed the next day. On March 12, 1992, Joseph Q. Adams was appointed Trustee in bankruptcy ("the Trustee") in all of these cases, and continues to serve in that capacity to the present time.

The seven cases had been administered by Einhorn and were administered by the Trustee more or less as a unit. After various dismissals and consolidations, there remains at the present time only one case. The findings and conclusions below will refer to "the case" or to "the estate" as a unit, rather than to the various cases and estates, unless otherwise specified.

After the date of entry of the order for relief in bankruptcy, Einhorn paid out further monies totalling $35,287.96, including $2,700.00 paid to his assistant Homer Muto. Einhorn's disbursements from the Sevitski

estate thus amounted to $323,661.24 plus $35,287.96 for a total of $358,949.20. As noted above, these disbursements were made from total funds collected by Einhorn of $376,254.74. As a result, Einhorn's receivership left the Sevitski estate in possession of net cash of $17,305.54, plus some unliquidated assets of problematical value. The latter were left to be administered by the Trustee.

Einhorn did not provide the statements and schedules which are required of debtors in bankruptcy, both voluntary and involuntary, by 11 U.S.C. § 521(1) and F.R.B.P. 1007. When the Trustee took over the receivership properties, he found that

> ... after being in receivership for almost a year, the Sevitski estates remained in a chaotic state. At the time of bankruptcy, no one appeared to be in control over the oil and gas operations, such as they were. There is apparently considerable environmental damage (not caused during the receivership) resulting from the operation of the Sevitski wells, most of which were in desperate need of plugging[;] yet ... Einhorn plugged no wells. During the course of the receivership, there should have been an inventory of properties compiled with files for each property. These files should have contained the legal description of each property and documentation to substantiate Sevitski's interest. Instead, ... the [T]rustee was afforded ... no legal descriptions of the properties owned, no indication of the interest owned by Sevitski, no indication of the fair market value, [and no] analysis of the liens and interests against the properties,

T'ee's obj. p. 8. However, Einhorn was "polite and cooperative with [the Trustee] and his attorneys in responding to their inquiries about the Sevitski cases," *id.* p. 10.

On March 27, 1992, Einhorn filed in the case his "Report and Accounting of ... State Court Receiver ..." ("Second Report"). Appended thereto was a copy of Einhorn's First Report in State court. The Second Report did "not include all income and disbursements to the time when the money was turned over to [the Trustee]," T'ee's obj. p. 5. The Second Report also did not include Einhorn's own time records after October 11, 1991.

Later, Einhorn "graciously provided [the Trustee] with a computer disk containing" additional information ("Third Report"). The Trustee found the Third Report "more instructive of how the receivership was conducted than the narrative portion of the [Second Report]," *id.*

On May 18, 1992, Luke for Wilson Corp. wrote the Trustee a letter asserting that "we are part of the receiver" and claiming "unpaid costs and expenses in the amount of $117,584.66," T'ee's obj. ex. 2. Later, Luke for Wilson Corp. filed a formal proof of claim in this amount.

On August 19, 1992, Einhorn filed his "Motion to Approve Administrative Claim of ... Prepetition Receiver." Therein Einhorn requested approval, with priority of payment as an administrative expense, of his fees and costs of $105,431.07 already approved by the State court, plus fees of $47,999.81 (at a rate of compensation of $250 per hour) and costs of $187.31 subsequently incurred, for a total of $153,430.88. Of this total, $15,000 had already been paid and $138,430.88 was still unpaid. This document incorporated the Second Report by reference. Various exhibits were supposed to be attached thereto but were omitted, and were supplied the next day by an "Amendment to Motion to Approve Administrative Claim of ... Prepetition Receiver." These exhibits included a narrative "Report of Receiver" ("Fourth Report") as ex. A. The Fourth Report was for the most part a copy of the First Report, modified by a few insertions and deletions. In the Fourth Report, Einhorn told this Court that he paid himself only $15,000 of his previously-awarded fee because he "preferr[ed] to use the estate's limited assets to place the oil and gas properties into production in an effort to generate revenue which would allow [him] to obtain some return for creditors and investors in the estate," *id.* p. 3. He did not mention that only $15,000 was on hand at the time anyway. He also deleted part of the First Report's description of the Tallgrass imbroglio. Other exhibits were a copy of the State court's order awarding fees as ex. B; and Einhorn's own time records from October 12, 1991 through March 23, 1992 as ex. C.

Einhorn's time records and lists of expenses are appended to his First and Second Reports (for the period from February 14, 1991 through October 11, 1991) and to his Fourth Report (for the period from October 12, 1991 through March 23, 1992). The time entries consist mostly of short notations of "T/C" (telephone conference) with various named parties, most commonly Muto or Luke. Some of these entries specify the subject matter of the phone call; most do not. Other time entries consist of notations such as the following:

| Date | Description | Hours | Amount |
|---|---|---|---|
| 05/13/91 | Contact Banks to determine where to send FAX notices | 1.00 | 250.00 |
| 05/19/91 | Draft Application to set amount of receiver's bond | 2.00 | 500.00 |
| 07/20/91 | Review mail | .25 | 62.50 |
| 08/08/91 | Meet with Homer [Muto?] at his home | 1.50 | 375.00 |
| 08/14/91 | [among others] FAX to Pryor office | 0.50 | 125.00 |
| 08/18/91 | Review mail | 1.00 | 250.00 |
| 09/02/91 | Review files | 2.00 | 500.00 |
| 09/16/91 | [among others] Review payables and reconcile checking account | 0.50 | 125.00 |
| 11/24/91 | Review mail and payables | 2.00 | 500.00 |
| 12/05/91 | Review mail and make bank deposit | 0.25 | 62.50 |
| | Court appearance on Ex Parte Application [among others] | 4.50 | 1,125.00 |
| 12/27/91 | Review mail and payables | 0.50 | 125.00 |
| 02/09/92 | Review mail and payables | 2.25 | 562.50 |
| 02/19/92 | Review mail and send Fed Ex to Homer [Muto?] | 0.75 | 187.50 |
| 03/23/92 | TC with Fred Luke, Sr. re: continuing operations | 0.25 | 62.50 |
| | Bank deposit and payables to keep properties in operation | 0.25 | 62.50 |

The time spent is recorded and billed in quarter-hour increments. There are no charges after March 23, 1992. Activities after the filing of the involuntary petitions total only about 22.5 hours.

On September 17, 1992, the Trustee by his attorney Sidney K. Swinson filed his "Objection to Allowance of Administrative Claim of ... Einhorn, Receiver." Attached thereto was the Trustee's rendering of the computerized Third Report, see T'ee's obj. ex. 1.

On October 27, 1992, an "Objection to Motion to Approve Administrative Claim of ... Einhorn, Receiver" was filed jointly by Jack M. Wallis ("Wallis"), Johnnie Cravotto ("Cravotto"), and Family Oil and Gas ("Family"), by their attorneys Jon B. Wallis and Cliff A. Stark.

On October 27, 1992, Einhorn's motion and the objections thereto came on for hearing. Evidence was received, including testimony by Einhorn personally and by Williams. Thereafter, the Court took the matter under advisement.

### CONCLUSIONS OF LAW

This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (O), 11 U.S.C. § 543(c)(2), § 503(b)(3)(E).

■ 11 U.S.C. § 543(a) provides that "[a] custodian with knowledge of the commencement of a case under this title concerning the debtor" shall "not make any disbursement from, or take an action in the administration of, property of the debtor ... in the possession, custody, or control of such custodian, except such action as is necessary to preserve such property." 11 U.S.C. § 543(b) provides that such custodian shall "deliver to the [T]rustee ... any property of the debtor held by or transferred to such custodian," and shall "file an accounting of any property of the debtor ... that, at any time, came into the possession, custody, or control of such custodian." 11 U.S.C. § 543(c) provides that the Bankruptcy "[C]ourt shall ... (2) provide for the payment of reasonable compensation

for services rendered and costs and expenses incurred by such custodian; and (3) surcharge such custodian ... for any improper or excessive disbursements ..." 11 U.S.C. § 503(b)(3) provides for allowance as an administrative expense of "the actual, necessary expenses ... incurred by ... (E) a custodian superseded under section 543 of this title, and compensation for the services of such custodian." 11 U.S.C. § 507(a)(1) provides for priority payment of "administrative expenses allowed under section 503(b) of this title ..." The maze of statutes reduces to this: Einhorn as receiver may be paid ahead of most other creditors for his "reasonable" fees and "actual, necessary" expenses. The inquiry is little different from that concerning other professional fees and expenses under 11 U.S.C. § 330(a)(1), § 503(b)(2). Therefore, the same standards governing other professional fees and expenses should govern receiver's fees and expenses too—unless good reason appears to apply different standards. No reason to apply any unusual standard appears in this case.

■ The burden is on Einhorn to show his entitlement to an administrative expense priority, *In re Mid Region Petroleum, Inc.*, 111 B.R. 968, 971 (B.C., N.D.Okl.1990), aff'd 1 F.3d 1130 (10th Cir.1993).

■ Einhorn has already been awarded $105,431.07 in fees and expenses by the State court for his receivership activities up to October 11, 1991. For purposes of this opinion, this Court presumes that such prior award of fees establishes the existence and validity of Einhorn's claim in at least the amount of $105,431.07. But such prior award of fees does not establish, as *res judicata* or collateral estoppel or otherwise, Einhorn's entitlement to priority payment of such sum or any part thereof as an administrative expense in this bankruptcy case. The parties are not the same—there was no bankruptcy Trustee in the State court receivership when Einhorn's fees were awarded. The issue is not the same—the State court's standards for allowing Einhorn's fees and expenses do not appear; but the State court surely was not asked, as this Court is, to decide whether

Einhorn should be paid before other creditors from the limited assets of an estate which is not just in receivership but is terminally bankrupt. It is the duty of this Court, and none other, to determine whether or to what extent Einhorn deserves to be paid out of the pockets of other, less deserving creditors. This Court proceeds to do its duty.

■ Einhorn's receivership is easily summarized. At best, the receivership broke even. Einhorn consumed the most readily liquid assets of the estate, taking in only a bit more than he paid out, and considerably less than he incurred in unpaid debt, in order to accomplish nothing—to leave the estate in the same condition in which he found it. Einhorn frightened the receivership creditors into submission (he calls it "cooperation") by telling them scary stories of the cost of bankruptcy; but his own receivership cost more money than there was available to pay. For this high price, the receivership creditors gained nothing.

The debts incurred by Einhorn's receivership were of two main types: (1) repair and operation costs of the oil and gas properties themselves, and (2) receivership administrative fees and expenses of Einhorn, Muto and Luke. The combined debts were *prima facie* excessive—that is, they equalled or exceeded the money available to pay them. If the debts of the first type (repair and operation costs of the oil and gas properties) were excessive, the fault is Einhorn's, for he incurred and paid them. If the debts of the second type (receivership administrative fees and costs) were excessive, the fault is also Einhorn's, for he created these debts himself, or allowed them to be created by his assistants. Either way, Einhorn's receivership was ill-managed.

On closer examination, it appears that the receivership administrative fees and costs, and particularly Einhorn's portion of them, are indeed excessive. As the Trustee points out, the maximum permissible fee for a bankruptcy Trustee under 11 U.S.C. § 326(a) in

Einhorn's position would be less than $12,-000. Einhorn wants more than ten times that amount. The Trustee's calculation does not count Trustee's attorney fees, but does not count Muto's and Luke's fees either. Einhorn was not competent to act as receiver of oil and gas properties two thousand miles away. His own participation in the case consisted largely of duplicative "supervision" of the real operatives of the receivership, Muto and Luke; or of relatively inconsequential duties, such as taking in the mail, sending out FAXes and Federal Express, elementary accounting or bookkeeping and writing checks. For such activities, which are unrelated to his expertise as a securities lawyer, he wants to be paid at a rate of $250 per hour, which exceeds the normal rates of competent specialist attorneys in Oklahoma, and surely exceeds bookkeeping and secretarial rates even in California. Einhorn says he did almost everything himself "to preserve the extremely limited cash resources of the estate," 1st Rep. p. 6. "If this is preservation, this Court wonders what waste would look like," *In re Mid Region Petroleum, Inc.*, 111 B.R. p. 972. To the extent that Einhorn spent his time lawyering and managing, such activities consisted in significant part of resisting Federal authority and obstructing bankruptcy administration in the Tallgrass case—not to mention making unauthorized disbursements from the Sevitski estate after the appointment of a bankruptcy Trustee, for which Einhorn might be surcharged. Other time was spent in activities whose nature and worth cannot be determined from the vague descriptions in the time records. Some of the hours are *prima facie* excessive—for example, although Einhorn had been a receiver a dozen times before, it took him two hours to draft a simple, even standardized pleading like an application to set the amount of his bond. The total number of hours may be inflated by the use of imprecise quarter-hour increments.

■ This Court's concern is the benefit conferred by Einhorn's receivership on the subsequent bankruptcy estate. Such benefit is the measure of a bankruptcy administrative expense which deserves priority of payment over other debts of the bankruptcy estate, *In re Lederman Enterprises, Inc.*, 997 F.2d 1321, 1323–1324 (10th Cir.1993); com-

pare *Ramos v. Lamm,* 713 F.2d 546, 556 (10th Cir.1983) quoting *Hensley v. Eckerhart,* 461 U.S. 424, 435–436, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40, 52 (1983). This Court does not punish attorneys, receivers or other professional persons, on the basis of hindsight. This Court tries to measure "reasonableness" and "benefit" prospectively, not retrospectively, *In re First Security Mortgage Co., Inc.,* 117 B.R. 1001, 1005 (B.C., N.D.Okl. 1990). Here, it is obvious, even prospectively, that the Sevitski estate was ready for bankruptcy long before Einhorn put it there. The receivership merely delayed the inevitable at great expense; and when bankruptcy finally came, the receivership had done almost nothing to mitigate losses or to facilitate liquidation. However, Einhorn did put a stop to Sevitski's irregular peddling of securities, did gather some of Sevitski's records, and did cooperate with the Trustee after the latter's appointment. These activities must have been of some value to the estate.

■ Einhorn's request for administrative-expense priority for the full amount of his fees and expenses is unreasonable; and his total fees and expenses are excessive. The only remaining question is, how unreasonable, or how excessive?

> There is no requirement ... that ... courts identify and justify each disallowed hour ... A general reduction of hours claimed in order to achieve what the court determines to be a reasonable number is not an erroneous method, so long as there is sufficient reason for its use ... [S]uch adjustments can take many forms, including a general write-down of total hours logged ... [On appeal] the question resolves itself into whether the ... court abused its discretion,

*Mares v. Credit Bureau of Raton,* 801 F.2d 1197, 1202–1203 (10th Cir.1986).

> There are several reasons why "a general write-down of total hours logged" might be called for. One is that [the applicant] simply wasted too much time doing what he did, *Mares v. Credit Bureau of Raton,* supra, 801 F.2d [1197] pp. 1203–1205

[ (10th Cir.1986) ]. Another is "egregious misconduct by the party requesting such compensation and reimbursement," ... *In re Republic Financial Corp.,* ... 128 B.R. [793,] 801 [B.C., N.D.Okl.1991]. Another is the result, or rather lack of result, of [the applicant's] efforts [as held in] *Ramos v. Lamm ...*,

*In re Burke,* 147 B.R. 787, 798 (B.C., N.D.Okl.1992). Here, Einhorn either wasted time or charged too much; he engaged in egregious misconduct in the related Tallgrass case; and the result of his efforts was almost nil. This Court determines that "a general write-down" of the requested administrative expense is called for. In its discretion, this Court further determines that an appropriate award to Einhorn of compensation for services and reimbursement of costs as a priority administrative expense in this case should consist of the following: the $15,000 already paid to Einhorn, plus an additional $12,000, for a total of $27,000.00.

Accordingly, the "Motion to Approve Administrative Claim of Irving Einhorn, Prepetition Receiver" is granted in the total amount of $27,000, of which the balance due of $12,000 shall be paid as soon as practicable, but is otherwise denied.

AND IT IS SO ORDERED.