In re YELLOW CAB COOPERATIVE
ASSOCIATION, EIN 84–0403997,
Debtor.

YELLOW CAB COOPERATIVE
ASSOCIATION, Plaintiff,

v.

Karen J. MATHIS; the Mathis Law
Firm, P.C.; Vicki S. Porter; and
Vicki S. Porter, P.C., Defendants.

Bankruptcy No. 93–23733–DEC.
Adv. No. 94–1499–SBB.

United States Bankruptcy Court,
D. Colorado.

Sept. 1, 1995.

Third Claims for Relief filed by Defendants Karen J. Mathis and the Mathis Law Firm, P.C. (collectively, "Mathis") on July 6, 1995, the Response thereto filed by the Debtor on July 31, 1995, the Motion to Reopen Hearing on Motion to Dismiss filed by Mathis on August 4, 1995, and the Supplement thereto filed by Mathis on August 9, 1995. Oral argument was heard by this Court on August 1, 1995.

The Plaintiff in this adversary proceeding seeks, generally, review and recovery of receiver's and attorney's fees received by Mathis, the Debtor's prior state court receiver, and her law firm, pursuant to 11 U.S.C. §§ 548 and 549.

By way of the instant Motion to Dismiss, Mathis asks this Court to dismiss the Plaintiff's first and third claims for relief based on an asserted lack of subject matter jurisdiction. Mathis claims that the Bankruptcy Court lacks jurisdiction to review her actions and fees as a state court receiver appointed for the Debtor prior to this Chapter 11 case. In addition, Mathis claims the protection of judicial immunity for actions taken and fees received in her role as receiver.

The Debtor maintains, generally, that the Bankruptcy Court has the jurisdiction and authority, indeed the responsibility, to review and approve or disallow the fees paid to the receiver by the Debtor, both pre- and post-petition. The Debtor argues that it was not a party to the receivership action, thus overcoming Mathis' claims of res judicata and judicial immunity. The Debtor also maintains that it was denied fundamental due process in the receivership action; it had no notice or meaningful opportunity to object to the fees paid to Mathis as receiver and as attorney for the receiver.

The Court, having reviewed the file, conducted a hearing, and being advised in the premises, makes the following findings of fact and conclusions of law and enters the following orders.

*Findings and Conclusions*

1. Yellow Cab Cooperative Association ("YCCA" or the Debtor) was established as a cooperative corporation in 1979 for the pur-

E. Hil Margolin, E. Hil Margolin, P.C., Denver, CO, for plaintiff.

Robert S. Treece, Michael L. Hutchinson, Michelle A. Pinkowski, Treece, Alfrey & Musat, P.C., Denver, CO, for defendants Karen J. Mathis and the Mathis Law Firm, P.C.

## ORDER ON MOTION TO DISMISS

SIDNEY B. BROOKS, Bankruptcy Judge.

THIS MATTER comes before the Court on the Motion to Dismiss Plaintiff's First and

pose of allowing the driver owners of the cooperative to purchase the assets of YCCA's predecessor in interest. YCCA filed Articles of Incorporation and Bylaws and subsequently, completed the purchase of assets.

2. In 1991, a dispute arose between two driver member factions over the control and management of YCCA. Apparently, YCCA held an election to select individuals who would serve on the Board of Directors. That election process resulted in challenge from a group of dissident driver members, and litigation ensued in the District Court for the City and County of Denver. Several cases that were filed were ultimately consolidated into one action docketed at No. 91 CV 2401.

3. On May 2, 1991, *nunc pro tunc* to April 29, 1991, the Denver District Court, Judge Lynne M. Hufnagel acting *sua sponte,* entered an Order appointing Karen J. Mathis to act as receiver on behalf of YCCA pursuant to Rule 66(a)(3) of the Colo.R.Civ.P. No creditor of YCCA at any time requested that the company be placed into receivership.

4. This Court is not advised and the record does not inform the Court as to the basis on which Mathis was selected, why she was selected, what her experience as a receiver, or with this particular type of business, was, or what prior connections, if any, she may have had with YCCA, other persons related to this case, or what, if any, connections she may have had with the appointing court.

5. By Order dated May 11, 1991, *nunc pro tunc* to May 1, 1991, Judge Hufnagel granted an oral motion by attorney Péter Borenstein, on behalf of YCCA and two of its remaining directors, to intervene in the action.[1] Although the Order purports to amend the caption of the case, this Court finds that use of the amended caption was sporadic, at best.[2] This Court is, moreover, fundamentally unclear as to what the extent and nature of Borenstein's role or representation was in the state court receivership case; the evidence is very sparse. A careful review of the many reports filed by Mathis in the state court seems to reveal that Borenstein's role was evidently limited to representation of YCCA in certain personal injury lawsuits that were then pending.[3] This Court can only conclude that, insofar as Borenstein's role in the receivership action is concerned, or his activity in representing YCCA in general legal affairs or management matters, it appears to have been, at most, infrequent, sporadic, and inconsequential.

6. The underlying litigation in state court, Consolidated Civil Action No. 91 CV 2401, District Court, City and County of Denver, State of Colorado, primarily involved allegations concerning the election of and control by YCCA's Board of Directors. During the lengthy proceedings it appears as though Judge Hufnagel never found that fraud or dishonesty was perpetrated by the management of YCCA upon any of its creditors or that YCCA's Board of Directors did not exercise reasonable and honest judgment in the exercise of YCCA's business affairs.

7. Judge Hufnagel addressed the issues of the underlying litigation in a lengthy Order dated May 12, 1991, which provided *inter alia* that an election of members to the Board of Directors would be held on July 12, 1991, subject to certain voting criteria and procedures established by the Court therein.

---

1. This Court has considered the additional information supplied by Mathis (and apparently uncontested by the Debtor) in the Motion to Reopen Hearing on Motion to Dismiss but deems it unnecessary to actually reopen the hearing itself.

2. *Compare,* 5/12/91 Order Regarding Election of the Board of Directors of the Yellow Cab Cooperative Association (listing Intervenors), *with* 10/8/91 Preliminary Response to Farazandeh, et al. Motion to Replace Receiver (no Intervenors listed), 6/15/93 Motion for Authority to Sell Assets of Yellow Cab Cooperative Association Pursuant to the Terms of Sales Agreement (same), and 9/11/93 Order authorizing the sale (same).

3. Curiously, at one time Mr. Margolin, current counsel for YCCA, orally stated that, while Borenstein's role was uncertain, he believed that he had represented several parties including the Debtor's largest secured creditor. This Court finds equally peculiar Mathis's characterization of Borenstein as "[o]utside [c]ounsel *[r]etained by Mathis* on [b]ehalf of YCCA." "Mathis' [Draft] Pretrial Disclosures Pursuant to Fed.R.Civ.P. 26(a)(3) & (a)(4)," attached as Exhibit B to Mathis' "Motion for Relief from Court Order of November 30, 1994 Requiring Direct Testimony by Sworn Declaration" filed August 29, 1995 (emphasis added).

8. The May 12, 1991 Order further prohibited any Board of Directors which might be elected from exercising any management authority until further Order of the Court and termination of the receivership.

9. Mathis, acting as receiver, conducted a successful election pursuant to Judge Hufnagel's Order and certified the results of the election to the Court on July 15, 1991. Despite the fact that the election resulted in an ultimately uncontested designation of a seven member Board of Directors, Mathis has never, at any time, moved to permit the elected Board of Directors to exercise its statutory authority, nor has she ever moved to terminate the receivership over YCCA.[4] Moreover, Mathis opposed motions filed by the parties to the underlying litigation which sought to have the receivership terminated.

10. Mathis continued in her role as Receiver and remained in management and control of YCCA for over 32 months, 29 of which were subsequent to the certification of the election she conducted.

11. On or about June 15, 1993, Mathis filed a motion with Judge Hufnagel which sought the authority to sell substantially all of the assets of YCCA. The proposed sale was objected to by several interested parties, including YCCA's largest secured creditor. Judge Hufnagel, however, at the request of Mathis, struck all of the objections and granted the sale motion on September 11, 1993.

12. The proposed sale of the assets would have amounted to a liquidation of YCCA. The only assets which would remain in YCCA following such sale would have been certain real property that bore potential environmental liability.

13. Mathis filed an application for the transfer of YCCA's assets with the Public Utilities Commission. On of about December 29, 1993, the staff for the Public Utilities Commission intervened to preserve the ability to file an objection to the proposed transfer.

14. Almost three years into the receivership, on December 29, 1993, YCCA's elected but, as yet still unseated, Board of Directors authorized and filed a Voluntary Petition pursuant to Chapter 11 of the Bankruptcy Code. Weeks later, and following four days of testimony and argument, Judge Donald E. Cordova of this Court ordered the turnover of assets remaining in Mathis' hands to the Debtor and concurrently denied Mathis' motion to dismiss the Voluntary Petition.[5]

15. The Debtor initiated the instant adversary proceeding by the filing of a Complaint on August 12, 1994. The Debtor seeks relief on four counts: (a) recovery of fees paid to Mathis pre-petition as fraudulent conveyances under 11 U.S.C. § 548; (b) recovery of the fees earned post-petition but prior to Judge Cordova's order requiring turnover pursuant to 11 U.S.C. §§ 543 and 549; (c) breach of fiduciary duty relating to Mathis' tenure as Receiver;[6] and (d) disallowance of approximately $21,000 in fees incurred post-turnover pursuant to 11 U.S.C. §§ 543 and 549.

16. This Court has statutory jurisdiction to review a range of issues and accord various relief. The Debtor seeks relief, in principal part, pursuant to 11 U.S.C. §§ 548 and 549, over which this Court has exclusive jurisdiction and for claims against the Receiver which are core proceedings under 28 U.S.C. § 157(b)(2)(C), (E), and (H). Moreover, and significantly, Mathis has filed a

---

4. The record presented to this Court is absolutely devoid of reasons, persuasive or otherwise, as to why the elected Board of Directors was not seated and why the receivership was allowed to last as long as it did.

5. This Court has relied, in good measure, on Judge Cordova's findings with regard to the matters of turnover and dismissal. Judge Cordova conducted a lengthy evidentiary hearing on the matters and made numerous findings which are relevant to the issues presently before this Court. This Court desires to not replicate the rather extensive and exhaustive evidentiary process, however, the review undertaken by this Court in connection with the instant Motion further supports Judge Cordova's conclusions and decision.

6. It appears that the Debtor alleges three breaches which relate to fees, (a), (b), and (j), all other claims are claims of omission, in which the Debtor alleges that Mathis failed to perform certain tasks or duties during the course of the receivership.

proof of claim which subjects her to the claims allowance process in this Court. *See. e.g., In re Manville Forest Products Corp.,* 896 F.2d 1384, 1389–1390 (2nd Cir.1990).[7]

17. Like Judge Cordova, this Court has grave concerns relating to notions of due process with regard to the receivership, in general,[8] and the procedure utilized by the state court in approving Mathis' fees, in particular. A review of the file, and specifically Mathis' Exhibit Z, compel this Court to echo Judge Cordova's comments,

> The Court also finds curious the arrangement in place for the payment of the receiver's fees. The evidence established that the receiver would submit an order—first of all, a receiver's report, and a motion requesting the awarding of fees and approving the receiver's report, together with an order setting a bar date to object to the fees and the report, and that both orders would be dated the same day; thus, precluding any opportunity to object to the report or the request for fees.

> It may not have been intended in that manner, but that was the net effect.

Cordova Partial Transcript, January 26, 1994, p. 9, II. 10–20.

18. Mathis maintains that, during the course of the receivership, she filed monthly receiver's reports wherein, *inter alia,* she sought approval of all fees for herself, her firm, and her additional counsel, the Porter co-defendants. Mathis maintains, and the state court record reflects, that each and every report was approved by Judge Hufnagel without objection.[9]

19. In total, it appears that Mathis sought and obtained approval of approximately $1.1 million between April 30, 1991 and December 17, 1993, for fees and costs paid to herself and her firm.[10] Of that amount, approximately $450,000.00 was received within one year prior to the filing of the Petition.

## Discussion

■ 20. This Court concludes that the portion of Mathis' Motion to Dismiss that deals with fee issues should be denied. This Court believes that it has the jurisdiction and authority, indeed it has the right and respon-

7. By filing a proof of claim against a bankruptcy estate, a creditor "triggers the process of 'allowance and disallowance of claims,' thereby subjecting himself to the bankruptcy court's equitable power." *Langenkamp v. Culp,* 498 U.S. 42, 44, 111 S.Ct. 330, 331, 112 L.Ed.2d 343 (1990) (quoting *Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33, 57–58 & n. 14, 109 S.Ct. 2782, 2798–2799 & n. 14, 106 L.Ed.2d 26 (1989). If a subsequent action alleging preferential transfers is filed against the creditor, that action becomes part of the claims-allowance process, "integral to the restructuring of the debtor-creditor relationship through the bankruptcy court's equity jurisdiction." *Langenkamp, supra* at 44, 111 S.Ct. at 331; *Granfinanciera, supra* at 57–58, 109 S.Ct. at 2798–2799.

8. "It is difficult to imagine how this entity [YCCA] was afforded due process when it was never represented in any of these proceedings, nor was it allowed to participate as an entity." Cordova Partial Transcript, January 26, 1994, p. 9, II. 1–4.

9. In general, the reports summarize cash receipts and disbursements, set forth the opening and closing bank balances for the receiver's bank account(s), and request approval of the receiver's fees and costs for the period at issue. In addi-

tion, the reports summarize the fee approval process.

> Due to the large amounts of legal time which are expended each week … the Receiver has elected to estimate Receivership time and legal time on a weekly basis. The Receiver's staff submits a weekly estimated billing summary to the Controller at YCCA from which he pays these estimated Receivership fees and legal expenses weekly. Payment of these fees and expenses is then subject to the Receivership Court's review and approval. Each month the Receiver prepares a complete billing statement…. Since the earlier, weekly estimated billing summaries are equal to or less than the ultimate Receivership and legal bills submitted monthly, the YCCA Controller may then have to pay an additional sum to reconcile the Receivership fees and legal expenses to be paid. Payment of these reconciling amounts is then subject to the Receivership Court's review and approval.

> Thirty–Second Receiver's Report and Request for Court Approval, p. 4.

10. This amount specifically excludes substantial additional fees paid to outside legal counsel, including H. Robert Walsh, Jr., Banner & Birch, Vicki S. Porter, P.C., Richard Bara, Holland & Hart, Aisenberg & Kaplan, M. Rappaport, Ben-

sibility, to deal with the fee issues presented in this adversary proceeding. The reasons and applicable law, taken collectively, as well as the reasons cited independently herein, support this conclusion.

21. This Court finds that, during the course of the nearly three-year receivership, the state court utilized what can only be described as an extraordinary and questionable procedure for approval of Mathis' fees. A review of Mathis' voluminous Exhibit Z reveals that actual notice of, and reasonable opportunity to evaluate and, if appropriate, object to the reports and requests for fees, was essentially non-existent.[11] Orders setting objection dates were routinely entered *after* the time period had already expired, and, in some instances, concurrently with the Order allowing the fees themselves.[12] Several times the Order establishing the objection period was not served on parties until *after* the Order allowing the fees had been entered and the time for objections was long past.[13] In an equally curious fashion, the reports disclosed, and Judge Hufnagel apparently allowed, *estimated* fees, rather than fees actually incurred.

22. This Court concludes that the process by which Judge Hufnagel approved professionals' fees was unseemly streamlined, almost invisible, and encased in mystery; it was a judicial process on automatic pilot.

23. At the very least,[14] the Debtor and interested parties were not afforded due process regarding the award of fees; neither the Debtor nor other interested parties were effectively given notice and an opportunity to object, or otherwise be heard, on the issue of the professionals' fees in this case.

24. The professionals' fee approval process utilized by Judge Hufnagel contrasts dramatically with the carefully-crafted, Congressionally mandated, statutory safeguards contained in the Bankruptcy Code. The Bankruptcy Code allows an award of compensation only for "reasonable compensation for actual, necessary services" and for reimbursement for "actual, necessary expenses." 11 U.S.C. § 330(a)(1). In determining the amount of reasonable compensation to be awarded, the court is directed to "consider the nature, the extent, and the value of such services," taking into account several enumerated factors, and specifically may not allow compensation for "unnecessary duplica-

---

nington & Reeve, Feiger, Collison & Killmer, and Breggin & Associates, P.C.

**11.** Service of the reports, Orders setting objection deadlines, and Orders approving fees was made only upon four to six individuals. Mathis argues that Borenstein was served as the allowed "counsel for YCCA." For some unknown reason, Judge Hufnagel ordered only one report, the 32nd Report and Request for Approval of Fees, to be posted at YCCA's office.

**12.** *See,* Order setting bar date for objections to Receiver's 1st Report and Request for Approval of Fees, entered 10/1/91, *nunc pro tunc* 6/21/91; ... 3rd Report, entered 12/13/91, *nunc pro tunc* 9/11/91—the day before objections were due; ... 4th Report, entered 10/18/91, *nunc pro tunc* 10/1/91; ... 5th Report, entered 12/13/91, *nunc pro tunc* 11/22/91—after objections were due; ... 6th Report, entered 1/31/9[2], *nunc pro tunc* 12/30/91; ... 7th Report, entered 1/31/92, *nunc pro tunc* 1/3/92; ... 16th Report, entered 12/14/92, *nunc pro tunc* 11/24/92; ... 17th Report, entered 12/14/92, *nunc pro tunc* 11/24/92—5 days after objections were due; ... 21st Report, entered 4/7/93—5 days after objections were due; ... 26th Report, entered 10/7/93, *nunc pro tunc* 8/30/93; ... 27th Report, entered 10/7/93, *nunc pro tunc* 8/30/93; ... 28th Report, entered 10/30/93, *nunc pro tunc* 10/1/93; ...

29th Report, entered 12/3/93, *nunc pro tunc* 11/3/93.

**13.** *See,* Certificate of Mailing on Order setting bar date for objections to Receiver's 7th Report and Request for Approval of Fees, dated 2/3/92 (after 1/31/92 Order approving fees and 1/20/92 deadline for objections); ... 13th Report, dated 8/24/92 (6 days after the Order approving fees and more than 1 month after the deadline for objections); ... 23rd Report, dated 6/16/93 (5 days after the Order approving fees and more than 1 month after the deadline for objections); ... 25th Report, dated 10/13/93 (6 days after the Order approving fees and more than 2 months after the deadline for objections); ... 29th Report, dated 12/6/93 (3 days after the Order approving fees and 2 weeks after the deadline for objections).

**14.** It could be argued that other interested parties, namely, the members of the cooperative, were likewise denied the opportunity to object. This Court refers to the case of the 31st Receiver's report. Service of the Order setting an objection bar date of 1/5/94 was accomplished on limited parties on 12/29/93. One driver, Joe Douglas, filed a motion for extension of time to file a response on 1/7/94, two days after the deadline, however, Judge Hufnagel denied the motion as untimely on 1/11/94.

tion of services" or services that were neither "reasonably likely to benefit the debtor's estate" nor "necessary to the administration of the case." 11 U.S.C. § 330(a)(3), (4). *See, also,* Rule 2016(a), Fed.R.Bankr.P. This Court has no substantive evidence concerning, and observes no such evaluation or examination of, the fees and costs at issue undertaken by the state court.

25. The Bankruptcy Code further provides that any attorney representing a debtor in connection with a bankruptcy case must file a statement of the compensation received within the year prior to the bankruptcy petition "for services rendered or to be rendered in contemplation of or in connection with the case by such attorney." 11 U.S.C. § 329(a). In the event that the compensation is found to exceed "the reasonable value of any such services, the court may ... order the return of any such payment, to the extent excessive." 11 U.S.C. § 329(b). This suggests an important and valuable process that is statutorily mandated to insure that only reasonable, necessary, beneficial professional services and fees are charged against and paid by a prospective or pre-petition debtor in bankruptcy.

26. This Court also notes that the appointment of Mathis as receiver appears to have been accomplished without advance notice, full disclosure, accountability, opportunity to object, or other procedural safeguards imposed by the Bankruptcy Code to protect the integrity and independence of the receiver/trustee position and the bankruptcy process. *See,* 11 U.S.C. § 327(a) (allowing the employment, upon court approval, of certain professionals "that do not hold or represent an interest adverse to the estate, and that are disinterested persons"), and Rule 2014(a), Fed.R.Bankr.P. *See, also, In re Ginco, Inc.,* 105 B.R. 620, 621 (D.Colo.1988) (The § 327(a) "standard is a strict one, 'broad enough to include anyone who in the slightest degree might have some interest or relationship that would color the independent and impartial attitude required by the Code.' ... The literal language of the law must be respected and followed.") (quoting 2 *Collier on Bankruptcy* § 327.03 at 327–19, 20 (15th ed. 1985)).

27. Recent case law has also focused attention on the application of Section 327(d) in cases where a bankruptcy trustee seeks to hire his or her own law firm to represent the trustee. Those cases indicate that a trustee should only be able to employ herself as counsel in certain unique and limited circumstances such as where the estate's assets consist principally of claims for preferences and fraudulent conveyances, where there is relatively little legal work to perform which does not merit the effort and expense of hiring an outside law firm or where substantial legal action must be undertaken immediately and the trustee cannot wait for the completion of the normal appointment process. *See, In re Gem Tire & Service Co.,* 117 B.R. 874 (Bankr.S.D.Tex.1990); *In re Kurth Ranch,* 108 B.R. 269 (Bankr.D.Mont.1989); *In re Butler Industries, Inc.,* 101 B.R. 194 (Bankr.C.D.Cal.1989), *aff'd,* 114 B.R. 695 (C.D.Cal.1990). Mathis' position as state court receiver, not at all unlike a bankruptcy trustee, does not appear to fit this standard or scenario.

28. Even assuming *arguendo* that notions of due process had not been offended in the matter of receivers and counsels' fees, this Court determines, nevertheless, that the authority exists, independently, under the Bankruptcy Code to review the subject fees.

29. This Court concurs with the Court in *In re Sundance Corp., Inc.,* 149 B.R. 641 (Bankr.E.D.Wash.1993) that,

On its face, § 543 does not give carte blanche to a bankruptcy court to review the orders of the receivership court, even if those orders mights be interlocutory, nor is § 543 explicit regarding whether a receiver can be surcharged by the bankruptcy court for improper actions taken pursuant to the appointing court's order, but not involving disbursement. But, since Congress gave bankruptcy courts the power to pay a receiver's expenses, costs and compensation in § 503(b)(3)(E), *it would be impossible to perform the tasks of determining reasonable compensation if a bankruptcy judge could not review the quality of a receiver's performance.* Although the duty to review a receiver's performance might have best been delegat-

ed to the appointing court, Congress chose to confer those powers on the bankruptcy courts.

*Sundance, supra,* at 650 (emphasis added).

30. The cases cited by Mathis in contravention of *Sundance* are not apposite. Both *In re Posadas Assocs.,* 127 B.R. 278, 281 & n. 10 (Bankr.D.N.M.1991) and *In re Uno Broadcasting Corp.,* 167 B.R. 189 (Bankr. D.Ariz.1994) dealt with receivers that had been *excused* from turnover under Section 543(d). In each case, the Court found that the receiver and his professional could not be compensated under § 543(c)(2) because that section only applied to receivers who had been subject to turnover. Where turnover had been excused, the Courts concluded, compensation was subject to the requirements of § 330.[15]

31. This Court has also found guidance in *In re Sevitski,* 161 B.R. 847 (Bankr. N.D.Okla.1993). *Sevitski* involved a receiver who was awarded fees and expenses of more than $105,000 pre-petition, but who paid himself only $15,000 pre-petition. The Bankruptcy Court concluded that

> [f]or purposes of this opinion, this Court presumes that such prior award of fees establishes the existence and validity of [the receiver's] claim in at least the amount of $105,431.07. But such prior award of fees does not establish, as res judicata or collateral estoppel or otherwise, [the receiver's] entitlement to priority payment of such sum or any part thereof as an administrative expense in this bankruptcy case. The parties are not the same—there was no bankruptcy Trustee in the State court receivership when [the receiver's] fees were awarded. The issue is not the same—the State court's standards for allowing [the receiver's] fees and expenses do not appear; but the State court surely was not asked, as this Court is, to decide whether [the receiver] should be paid before other creditors from the limited assets of an estate which is not just in receiver-

ship but is terminally bankrupt. It is the duty of this Court, and none other, to determine whether or to what extent [the receiver] deserves to be paid out of the pockets of other, less deserving creditors.

*Sevitski, supra* at 854.

*See, also, In re Acme Heating & Air Conditioning Supply, Inc.,* 20 B.R. 129 (Bankr. D.R.I.1982) (limiting compensation under § 543(c)(2) to the statutory fee available to chapter 7 trustees pursuant to § 326(a)). "[I]t still seems reasonable that compensation for the same or similar services should bear some relationship to one another, regardless of the forum in which each is performed." *Acme Heating, supra* at 131.

32. Rule 66, Colo.R.Civ.P., "provides no framework within which a receiver is to operate, nor any framework for the liquidation or reorganization of an entity for whom the receiver is appointed, and no framework for the payment and priority of creditors. The Bankruptcy Code, however, does provide such a framework." Cordova Partial Transcript, January 26, 1994, p. 11, II. 13–19.

33. This Court has previously found that the authority to review and approve professionals' fees, which are part of or related to a bankruptcy case, constitutes a separate and independent basis on which this Court has jurisdiction and authority to hear the within adversary proceeding. *See,* 11 U.S.C. § 329 and Rules 2016 and 2017, Fed.R.Bankr.P.

> Section 329 of the United States Code, and Rule 2017, Fed.R.Bankr.P., give expansive reach to the Bankruptcy Court for reviewing, approving or disapproving, attorney's fees incurred for services 'in any way related to the bankruptcy case.' These provisions are meant to protect the creditors and the debtor against overreaching by attorneys. Fees are reviewable by the Bankruptcy Court not withstanding [sic] the source of payment. *In re Walters,* 868 F.2nd [sic] 665, 667–668 (4th Cir.1989).

---

**15.** In fact, the *Uno Broadcasting* case contains language which implies that receiver fees incurred prior to the date of the order excusing turnover may, at the option of the receiver, be approved by the appointing court or by the bankruptcy court pursuant to 11 U.S.C. § 543(c)(2).

*Uno Broadcasting, supra,* at 201. This interpretation, in the opinion of this Court, violates the Supremacy Clause and would lead to forum shopping and other equally untenable or mischievous results.

852

Even if payments to a debtor-in-possession's counsel are from third-party funds and not estate funds, under Section 329 the Bankruptcy Court has jurisdiction to review and order the return of improper fees to any entity which paid them. *In re Land*, 116 B.R. 798 (D.Colo.1990), *aff'd and remanded by*, 943 F.2d 1265 (10th Cir.1991).

*In re Yellow Cab Cooperative Association*, 178 B.R. 265, 270 (Bankr.D.Colo.1995).

*See, also, In re Dixon*, 143 B.R. 671, 676 (Bankr.N.D.Tex.1992) ("courts interpreting § 329 and [Rule] 2017, [Fed.R.Bankr.P.,] along with their statutory predecessors, leave no doubt that it was Congress' intent to permit the courts to reexamine the reasonableness of fees within the one-year look back period, irrespective of the nature of the services rendered"); *In re Office Products of America, Inc.*, 136 B.R. 964, 969 (Bankr. W.D.Tex.1992) ("Section 329 permits a court to cancel any agreement for payment for services rendered pre-petition in contemplation of or in connection with a bankruptcy case, to the extent the proposed compensation exceeds the reasonable value of those services"); *In re Symes*, 174 B.R. 114, 116–117 (Bankr.D.Ariz.1994) (counsel which receives pre-petition payments of attorney fees on account of legal services which are neither in relation to nor in connection with bankruptcy is in no better position than any other pre-petition creditor); *Matter of Pulliam*, 96 B.R. 208, 209 n. 1 (Bankr.W.D.Mo.1986) (same).

34. Judge Hufnagel, in issuing orders with regard to the fees in the receivership action, was acting under broad, undefined equitable powers which are not codified. "These equitable powers should give way to the Bankruptcy Code, which Congress has established for these very purposes." Cordova Partial Transcript, January 26, 1994, p. 14, II. 8–10.

35. Mathis' argument that this Court is barred from proceeding on this matter is not persuasive. Mathis' implicit reliance on the doctrines of *res judicata* and collateral estoppel presuppose that the Debtor was a party to the receivership proceedings. *See, Satsky v. Paramount Communications, Inc.*, 7 F.3d 1464, 1467 (10th Cir.1993); *Murdock v. Ute Indian Tribe of Uintah & Ouray Reservation*, 975 F.2d 683, 687 (10th Cir. 1992); *In re Austin*, 93 B.R. 723 (Bankr. D.Colo.1988). Judge Cordova has found that YCCA/the Debtor was never allowed to be a party to the receivership. Moreover, Judge Cordova found that the individual Board members were even threatened with contempt if they so much as tried to participate in the receivership process.[16] Since Mathis never appealed this determination, she, in turn, is herself bound thereby.[17]

36. This Court concludes that, in the context of an ensuing bankruptcy case under Title 11, the Bankruptcy Code provides authority for the review of fees received pre-petition by a receiver and her attorneys appointed by a state court, regardless of whether the fees have been approved by the appointing court.[18] This conclusion is strongly reinforced when the appointing court approved the fees in a cursory, summary manner, seemingly ignoring basic principles of notice and due process.

37. As to the claimed breaches of fiduciary duty, separate and distinct from professionals' fees, and arising *from actions or omissions* during the receivership, this Court concludes that Mathis may, indeed, be entitled to the protection of judicial immunity. No allegations appear that Mathis acted outside the scope of authority granted her by Judge Hufnagel. *Accord, In re Paren*, 158 B.R. 447, 450 (Bankr.N.D.Ohio 1993). *See, generally, Ford v. Kenosha County*, 160 Wis.2d 485, 498–499, 466 N.W.2d 646, 651

16. *See*, Cordova Partial Transcript, January 26, 1994, p. 16, II. 11–14 (colloquy between the Court and Ms. Porter).

17. Similarly, Judge Cordova has previously ruled that the Debtor was denied due process in the receivership action. Mathis did not appeal that determination either.

18. Significantly, this Court notes that other types of state court judgments and orders are routinely subject to application of the Bankruptcy Code and subsequent substantive modification. *E.g.*, § 510 (subordination), § 524 (discharge), § 547 (avoidance).

(1991); *New Alaska Dev. Corp. v. Guetschow,* 869 F.2d 1298, 1303–1304 (9th Cir.1989); *Brewer v. Hill,* 453 F.Supp. 67, 69 (N.D.Tex. 1978); *Bradford Audio Corp. v. Pious,* 392 F.2d 67, 72–73 (2nd Cir.1968). *Compare, T & W Inv. Co., Inc. v. Kurtz,* 588 F.2d 801, 802 (10th Cir.1978) (immunity where parties had ample opportunity to object to the receiver's actions in the state court proceeding); *City Partners, Ltd. BMG v. Jamaica Savings Bank,* 454 F.Supp. 1269, 1276 (E.D.N.Y.1978) (a receiver acting beyond the scope of its authority).

38. In the event that such allegations were made, this Court determines that the proper forum for litigating breaches of fiduciary duty arising *from actions or omissions* during the receivership, as opposed to the discrete issue of fees, likely lies in the state court system.

Accordingly, it is

ORDERED that the Motion to Dismiss Plaintiff's First and Third Claims for Relief is GRANTED, IN PART, as to paragraphs 71(c), (d), (e), (f), (g), (h), (i), (j) and (k) of the Complaint, and DENIED, IN PART, as to the remainder of the relief requested. And it is

FURTHER ORDERED that the Motion to Reopen Hearing on Motion to Dismiss is DENIED. And it is

FURTHER ORDERED that the parties' request for authorization to pursue an immediate and expedited appeal of this Order to the District Court is DENIED, unless of course, the District Court decides otherwise. And it is

FURTHER ORDERED that, in the event that an appeal is permitted, this Court shall reset the currently scheduled trial.